NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0471n.06

No. 08-3542

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Jul 08, 2009**
LEONARD GREEN, Clerk

GUSTAVO PELAEZ,

    Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON PETITION FOR REVIEW OF A
FINAL ORDER OF THE BOARD OF
IMMIGRATION APPEALS

Before: NORRIS, BATCHELDER, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. Gustavo Pelaez petitions for review of the Immigration Judge's denial of his application for asylum and other relief. We deny the petition.

I.

Pelaez is a 58-year-old native and citizen of Colombia. His wife, Luz Gladys Arbelaez, lives in Medellin, Colombia. Together they have two daughters: Isabel, 20, who lives in Colombia, and Diana, 26, who lives in the United States. On November 13, 1997, Pelaez entered the United States without authorization. On June 24, 2002, he filed an application for asylum and withholding of removal with an asylum officer. On October 27, 2003, the officer commenced removal proceedings against Pelaez by filing a Notice to Appear (NTA) with the immigration court, charging him with entering the country without being admitted or paroled after inspection by an immigration officer,

in violation of 8 U.S.C. § 1182(a)(6)(A)(i). Pelaez thereafter filed a written pleading with the immigration court, in which he admitted the factual allegations in the NTA and conceded removability. He also requested asylum, and withholding of removal under the Immigration and Nationality Act (INA) and the Convention Against Torture (CAT), or in the alternative, voluntary departure.

Pelaez provided only bare-bone allegations of harassment in his application for relief. In his testimony before the Immigration Judge (IJ), however, Pelaez testified in greater detail about alleged harassment in Colombia. That harassment arose, Pelaez said, from his high-level involvement in trade unions from 1974 through 1980, from his role as a spokesman for the Allied Union Movement of the Social Conservative Party of Colombia (in which he spoke out against guerilla violence), and from his related work as a governmental ombudsman to farmer and community-action groups in 1986.

Pelaez testified that he and his family were attacked twice in Colombia. First, in 1979, as Pelaez left a union meeting, a stranger stabbed him in the foot and shoved his head against a wall. Pelaez "was not seriously injured" in that attack. Second, in 1996, as his daughter Diana left school, a car "push[ed] her into the ground[,]" slightly injuring her legs. The car left the scene before anyone could record its license-plate number. Later that day, Pelaez received a telephone call in which an anonymous individual told him that what happened to Diana was "nothing" compared to what would happen if Pelaez continued to be involved in politics.

Pelaez testified about other alleged harassment as well. He said that, in 1994, two strangers followed him as he left his workplace in Medellin. He later quit his job and moved to Cartagena,

leaving his family behind in Medellin. While in Cartagena, Pelaez learned that a stranger bearing an accent from his hometown had asked for him by name. Because Pelaez had no acquaintances in Cartagena, Pelaez thought his harassers had tracked him down. When Pelaez told his wife about the stranger, she said "they" continued to call at Pelaez's home, too. Pelaez was concerned for his family's safety, so he returned to Medellin and began working for the transportation department of the local municipal government.

Pelaez testified that, by the end of 1994, he had received between 15 and 20 anonymous telephone calls. The callers told Pelaez to stop denouncing "the participation of the revolutionaries," and to cease his own political activities, or "they would shut [his] mouth up." The callers described details of his daughter Isabel's appearance, and of his wife and daughter's schedules. The callers also threatened to harm Isabel if Pelaez continued working for the municipal government. Those threats caused Pelaez to quit his job in 1995.

Pelaez testified that he could not identify his harassers, but that he believed they belonged to the Revolutionary Armed Forces of Colombia, the National Liberation Army, or other paramilitary organizations operating in the department of Antioquia. He reported the harassment to his governmental supervisors in Antioquia, but they said that it would be useless for him to complain to the police. Pelaez also testified that he had intended to return from the United States to Colombia by 1998, but worsening conditions there prevented his return.

The IJ denied Pelaez's claims for relief, notwithstanding the government's stipulation that Pelaez was credible. The IJ found that Pelaez's asylum application was time-barred, because he had not filed it within one year of his arrival in the United States. The IJ further determined that the

physical attacks on Pelaez and Diana, and the threatening phone calls to Pelaez and his family, did not rise to the level of past persecution. The IJ also found that Pelaez failed to establish that it was more likely than not that he would face future persecution or torture in Colombia. Consequently, the IJ found Pelaez ineligible for withholding of removal under the INA and the CAT. The Board of Immigration Appeals (BIA) affirmed without opinion.

This petition for review followed.

## II.

Because the BIA affirmed the IJ's decision without opinion, we review the IJ's decision directly. *Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003). We review the IJ's legal findings *de novo*, *see Ramirez-Canales v. Mukasey*, 517 F.3d 904, 907 (6th Cir. 2008), and factual findings for substantial evidence. *Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005). Under the substantial-evidence standard, we uphold the IJ's findings "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)).

## A.

An applicant must qualify as a "refugee" to be eligible for asylum. *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003). A refugee is someone who "is unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42). The applicant bears the burden of proving refugee status, and his testimony, "if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a).

Pelaez challenges the IJ's determination that his asylum application was untimely. An alien must demonstrate by clear and convincing evidence that he filed his asylum application within one year of his arrival in the United States, *see* 8 U.S.C. § 1158(a)(2)(B), unless "the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application" within the required one-year period. *Id.* § 1158(a)(2)(D). "No court shall have jurisdiction to review any [such] determination of the Attorney General[.]" *Id.* § 1158(a)(3).

Here, Pelaez did not file his asylum claim "within [one year] after the date of [his] arrival in the United States." *Id.* § 1158(a)(2)(B). Pelaez contends the IJ did not made *any* determination as to whether there were extraordinary or changed circumstances in Colombia in 2002 that excused the untimeliness of his application. But the IJ considered, and specifically rejected, Pelaez's argument that "worsening country conditions prevented him from returning safely." *See* J.A. 26. As that argument included consideration of 2002 conditions in Columbia, so too did the rejection. Thus the IJ did determine that Pelaez had not shown the changed circumstances necessary to excuse the untimeliness of his asylum application; and we in turn lack jurisdiction to review that determination. 8 U.S.C. § 1158(a)(3).

## B.

Pelaez also seeks withholding of removal under the INA and the CAT. When reviewing the denial of withholding of removal, we uphold the IJ's determination unless it is "manifestly contrary to the law." *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001). "To prevail on a petition for withholding

of removal under the INA, or on a petition for withholding of removal under the CAT, an alien must

show that there is a 'clear probability' that [he] would be subject to persecution, for the INA, or to

torture, for the CAT, on the basis of one of the five statutorily protected grounds were [he] removed

from this country." *Kouljinski v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007). The "clear probability"

standard requires that "[a]n applicant who has not suffered past persecution . . . establish that it is

more likely than not" that he would be persecuted or tortured on the basis of one of the protected

grounds upon his return. 8 C.F.R. § 1208.16(b)(2).

Pelaez argues that substantial evidence did not support the IJ's denial of withholding of

removal under the INA. Pelaez contends that the harassment to which he and his family were

subjected did, in fact, rise to the level of past persecution. "[A]ctions that might cross the line from

harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal

searches, confiscation of property, surveillance, beatings, or torture." *Gilaj v. Gonzales*, 408 F.3d

275, 285 (6th Cir. 2005). Here, neither of the alleged attacks resulted in serious injury, and the

telephone threats never materialized into physical violence. In addition, Pelaez's four-year delay in

applying for asylum, based upon events that for the most part had occurred years before, undermines

his allegation that those events amounted to persecution. Considered in light of our deferential

substantial-evidence standard, therefore, the record does not compel the conclusion that Pelaez

suffered past persecution.

Pelaez next contends that he has proven a likelihood of future persecution in Colombia. But

the IJ's finding to the contrary is again supported by substantial evidence. No member of Pelaez's

family has been harmed since he left Colombia; and, as the IJ noted, Pelaez has not "seriously

attempted" internal relocation of his family within Colombia as a means of avoiding future harassment. Moreover, many of the incidents upon which Pelaez relies to show a likelihood of future harassment occurred decades ago, with one incident dating back to 1979. The record thus does not compel the conclusion that Pelaez is "more likely than not" to face future persecution. *Fang Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008).

Pelaez's challenge to the IJ's denial of withholding of removal under the CAT likewise fails. Pelaez's burden was to show that he would "more likely than not" face torture upon his return to Colombia. 8 C.F.R. § 1208.16(b)(2). But Pelaez neither claims that he had been tortured in the past, nor provides any evidence that the Colombian government would acquiesce to his torture in the future. The record therefore does not support, much less compel, a conclusion that Pelaez is "more likely than not" to face torture if removed to Colombia. *Id.*

### III.

Pelaez's claims, in summary, are not frivolous. But they ultimately founder on the deferential standard of review that we are required to apply to them. We therefore deny the petition.